**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

SHARON COLE,

                    Plaintiff,

vs.                                      Case No.  3:08-cv-114-J-JRK

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.
_____/

## <u>OPINION AND ORDER</u>[1]

### <u>I.  Status</u>

      Sharon Cole ("Plaintiff") is appealing the Commissioner of the Social Security Administration's final decision denying her claim for disability insurance benefits.  Her alleged inability to work is based on the following physical impairments: bilateral carpal tunnel syndrome, right heel reconstruction, as well as injuries to her right and left hands, her neck, her back, her left shoulder, both knees, and her left ankle.  Transcript of Administrative Proceedings ("Tr.") at 48-49.  In addition to the physical impairments, Plaintiff alleges she suffers from the mental impairment of anxiety.  <u>Id.</u> at 319.  Plaintiff was found not disabled by Administrative Law Judge ("ALJ") William H. Greer, in a Decision entered on July 21, 2007.  <u>Id.</u> at 10-21.  Plaintiff has exhausted the available administrative remedies and the case is properly before the Court.

---

[1]     The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  <u>See</u> Notice, Consent, and Order of Reference - Exercise of Jurisdiction by a United States Magistrate Judge (Doc. No. 10).

Plaintiff argues the ALJ erred in three ways: (1) By improperly discounting the opinions of Plaintiff's treating and examining physicians with regard to Plaintiff's physical pain complaints (Doc. No. 9; "Pl.'s Mem." at 5-9); (2) By mischaracterizing mental health records in discounting Plaintiff's treating mental health physician and in ultimately finding that the symptoms of Plaintiff's anxiety disorder do not limit her from working; or alternatively, not including all of Plaintiff's mental health restrictions in the hypothetical posed to the vocational expert (id. at 10-12); and (3) By improperly assessing her residual functional capacity (id. at 12-13). Because the ALJ did not sufficiently explain the basis for discounting the opinion of Plaintiff's treating mental health physician and for finding that Plaintiff's symptoms of her anxiety disorder do not limit her from working, this matter is due to be reversed and remanded for further administrative proceedings.

## II. Background

Plaintiff was forty-six years old when her hearing was held before the ALJ on December 6, 2006. Tr. at 317, 320. Plaintiff alleges the onset date of disability was July 9, 2004. Id. at 10, 45. Plaintiff's past relevant work includes working as an accounting clerk, an accounts receivable clerk, a credit analyst, a platinum research assistant, a platinum travel agent, a portfolio specialist, and working in the membership rewards department of a merchandising business. Id. at 50.

**A.  Medical Evidence in the Record**

   **1.  Dr. Nabizadeh**

The record shows that Plaintiff was consistently treated by Dr. Shahriar A. Nabizadeh ("Dr. Nabizadeh") for pain management from November of 2000 to March of 2006.[2]  See Tr. at 147-194; 269-272.  During Plaintiff's first visit with Dr. Nabizadeh on November 9, 2000, Plaintiff was diagnosed with "[c]hronic myofascial pain," "[l]eft sacroiliitis," and "[l]ateral upper trapezius myofascial spasm."  Id. at 194-95.  She was placed on Oxycontin (a pain reliever) and Skelaxin (a muscle relaxant).  Id. at 195.  On March 1, 2001, Plaintiff was diagnosed with "Degenerative disc disease lumbrosacral spine."  Id. at 191.  She also continued to suffer from myofascial pain.  Id.  Thereafter, Plaintiff was routinely seen by Dr. Nabizadeh and treated for similar medical problems.  See id. at 165-190.  During this period of time, various treatment plans were developed and implemented.  See id.

On April 23, 2004, approximately two months before Plaintiff's alleged onset date of disability, Plaintiff was seen for a follow-up visit.  Id. at 164.  During the visit, Plaintiff reported she was somewhat stressed because of a new work environment, but her "pain management regimen [was] effective."  Id.  As such, Dr. Nabizadeh continued Plaintiff's previous pain management regimen (consisting of the medications Avinza, Zanaflex, and Zoloft).  Id. at 164, 165.  On June 22, 2004, Plaintiff again was seen for a follow-up visit, at which time she reported another doctor had diagnosed her with "pneumonia."  Id. at 163.  She was primarily concerned about the pneumonia, as it had apparently been manifesting itself for six previous

---

[2]      The ALJ and the Commissioner refer to Dr. Nabizadeh as Plaintiff's primary care physician. See Tr. at 14; Doc. No. 12 (Deft.'s Mem.) at 6.  Plaintiff indicates Dr. Nabizadeh is a "pain management doctor" and also her "main treating doctor[.]" Pl.'s Mem. at 2.

months.  Id.  She did complain that the numbness in her right side was worse than that in her left upper extremity.  Id.  However, she indicated the "pain that [was] bothering her for the past four [to] six weeks ha[d] decreased significantly."  Id.  Dr. Nabizadeh ordered a chest CT scan "to rule out any structural pathology or [an] underlying cause for chronic bronchitis."  Id.  He also recommended continuing Plaintiff's pain regimen.  Id.

On August 12, 2004, after Plaintiff's alleged onset date of disability, Plaintiff again saw Dr. Nabizadeh for a follow-up visit.  Id. at 162.  Plaintiff reported having suffered a "nervous breakdown" due to "the stress of coming out of her job."  Id.  Apparently, Plaintiff was "about to be demoted for 'spite[.]'"  Id.  Plaintiff discussed obtaining a new job with Dr. Nabizadeh.  Id.  Plaintiff was interested in becoming a nursing assistant, and the "physical demands" of that job were discussed.  Id.  Plaintiff was instructed to continue her previous medications and return in two months for a follow-up visit.  Id.

During her visit on October 19, 2004, Plaintiff reported having recently been involved in a motor vehicle accident.  Id. at 161.  Dr. Nabizadeh observed that Plaintiff "[did] not suffer[] any long-lasting sequelae from the motor vehicle accident," and other than appearing fatigued and anxious,  Plaintiff "overall [was] doing very well."  Id.  Plaintiff was told to continue taking Avinza and Xanax.  Id.  On February 3, 2005, Plaintiff reported being "easily overwhelmed and frustrated," as well as suffering from "[t]ension headaches[.]"  Id. at 160.  She was instructed to continue with her medications.  Id.

During her visit on April 22, 2005, Plaintiff indicated that she had "tried to do work in the house [and] pulled [her] chest, groin, [and] strained [her] neck."  Id. at 152.  On that date, Dr. Nabizadeh completed a "Treating Source Mental Health Report[.]"  Id. at 158-59.  He

indicated that Plaintiff suffered from "[m]ild anxiety," as well as "chronic myofascial pain," but her concentration, orientation, and memory were reported "[n]ormal[.]" Id. When asked to "provide a statement about what your patient can still do despite his / her mental impairment(s), addressing your patient's capacity for understanding and memory, sustained concentration and persistence, social interaction, and adaptation," Dr. Nabizadeh wrote: "although able, secondary to significant limitations in sit/stand/walk/prolonged posture, she will be unable to perform any duties." Id. at 158. When asked whether Plaintiff was capable of working for eight hours in a given day, Dr. Nabizadeh responded, "No–[.]" Id.

On May 20, 2005, Plaintiff saw Dr. Nabizadeh again, complaining of a sprained right ankle and pain in her right foot. Id. at 151. An X-ray of the cervical spine was ordered. Id. Plaintiff was directed to continue with her medications. Id. On May 26, 2005, Plaintiff had several X-rays taken, including those of "bilateral knees," "right foot," "cervical spine," and lumbar spine[.]" Id. at 153-57 (capitalization omitted). Radiologist Daniel Wardrop, M.D. ("Dr. Wardrop") read the X-rays. Id. With respect to Plaintiff's bilateral knee X-rays, Dr. Wardrop opined she suffered from "mild degenerative changes of the right knee" and "mild degenerative changes of the left knee plus there [was] a marked abnormality to the posterior central tibial plateau with numerous folds present within the bony structure." Id. at 153 (capitalization omitted). The right foot X-ray showed "mild degenerative changes of the first right mtp joint" and "deformed calcaneus from prior healed fracture with two screws for internal fixation." Id. at 154 (capitalization omitted). The cervical spine X-ray produced "no acute findings"; Dr. Wardrop indicated Plaintiff suffered from "moderate degenerative disc disease of the mid cervical spine with more mild degenerative disc disease of the upper and

lower cervical spine." Id. at 155, 157 (capitalization omitted). Finally, the lumbar spine X-ray showed "mild degenerative disc disease and degenerative joint disease of the lower lumbar spine." Id. at 156 (capitalization omitted).

During Plaintiff's next visit with Dr. Nabizadeh on June 17, 2005, Plaintiff reported having fallen and injuring her "l[eft] great toe nail." Id. at 150. On July 15, 2005, Plaintiff complained of "l[eft] heel pain," and on September 20, 2005, she complained of the "l[eft] hip start[ing] to bother her." Id. at 149, 148. On December 9, 2005, Plaintiff reported a persistent increase in pain. Id. at 272. Dr. Nabizadeh's notes from January, February, and March 2006 visits contain no significant pain complaints by Plaintiff or findings related thereto. Id. at 270, 269, 271. A whole body scan of Plaintiff was performed on January 18, 2006, apparently at Dr. Nabizadeh's request due to Plaintiff's complaints of left hip pain. Id. at 273. Dennis W. Wulfeck, M.D. read the body scan and indicated the body scan was "normal," with "no focal areas of increased uptake. . . noted." Id.

### 2. Dr. Dehgan

On July 25, 2005, Dr. Robert Dehgan ("Dr. Dehgan") performed a consultative physical examination of Plaintiff, at the request of the Social Security Administration. Id. at 211-18. Dr. Dehgan reported Plaintiff complained of "neck pain, back pain, arm pain, and pain in her feet since 1997." Id. at 211. Plaintiff had "[n]o problems with activities of daily living," and was able to do "some cleaning, cooking, washing, [and] vacuuming all with difficulty." Id. Plaintiff's gait was described as "normal . . . but slow." Id. at 212. Dr. Dehgan noted Plaintiff had "no discomfort getting in and out of the chair from the exam table." Id.

After reviewing the May 2005 X-rays Plaintiff brought to the examination, Dr. Dehgan reported:

> Review of x-rays brought with the patient shows degenerative arthritis and disc disease at L5 S1. There is severe degenerative disc disease involving multiple levels from C4-7, degenerative arthritis left knee involving tibial femoral and patellofemoral. Degenerative arthritis right foot at the talo tibial joint. Sub talor joint is fused, 2 screws were noted in the calcaneus. There [are] also degenerative changes in the mid tarsal joints.

Id. at 215. Dr. Dehgan concluded Plaintiff "[was] not a candidate to return to gainful employment." Id.

### 3. Dr. Wikstrom

Plaintiff's treating psychiatrist, Dr. Thomas Wikstrom ("Dr. Wikstrom"), completed a "Treating Psychiatrist's or Psychologist's Statement" on November 20, 2006. Id. at 250. Dr. Wikstrom indicated he had been treating Plaintiff since November 2, 2005. Id. Plaintiff was described as having "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week." Id. at 251. Plaintiff was also described as suffering from "[m]arked restriction of activities of daily living," "[m]arked difficulties in maintaining social functioning," and "[r]epeated episodes of decompensation, each of extended duration." Id.

Dr. Wikstrom's treatment notes indicate that on November 2, 2005, Plaintiff was diagnosed with "anxiety" and met the "DSM IV criteria [for] panic disorder[.]" Id. at 253. One month later, on December 2, 2005, Dr. Wikstrom noted Plaintiff was not feeling well, possibly because her "husband want[ed] to break up." Id. at 256. However, Dr. Wikstrom opined Plaintiff was doing "better." Id. On January 9, 2006, Plaintiff again was reported to be doing "better" and her anxiety had decreased. Id. at 257. On March 24, 2006, Plaintiff

told Dr. Wikstrom that she would be traveling to Singapore with her husband, and she reported an increased anxiety level. Id. at 258. On May 1, 2006, Plaintiff reported an increase in pain, as well as anxiety. Id. at 259. On May 30, 2006, Plaintiff was doing "better" and her anxiety level had decreased. Id. at 260. On July 28, 2006, Plaintiff did not "feel good" and reported an increase in stress. Id. at 261. On August 25, 2006, Plaintiff reported having been "beat[en] up by [her] husband" and having an increased level of stress and pain. Id. at 265. However, on September 22, 2006, Plaintiff apparently felt better, with decreased anxiety. Id. at 266. During the last documented visit with Dr. Wikstrom, on November 20, 2006, Plaintiff reported an increase in stress. Id. at 267.

After Plaintiff's hearing, on January 18, 2007, Dr. Wikstrom completed a questionnaire at the request of Plaintiff's hearing representative, Susan A. Butler. Id. at 294. Dr. Wikstrom indicated Plaintiff suffers from "severe panic disorder with marked symptoms," even "when she is taking her medication as prescribed[.]" Id. Dr. Wikstrom further stated Plaintiff's "condition allow[ed] for periodic exacerbations of symptoms as described in the Treating Statement[,] even with the use of her medications[.]" Id. Finally, Dr. Wikstrom opined Plaintiff would not be able to return to work and "focus and concentrate on tasks at hand[.]" Id.

### 4. Dr. Caudill

In June of 2006, Dr. Wikstrom referred Plaintiff to a pain management specialist, Dr. Jeffrey Caudill ("Dr. Caudill"). Id. at 262. In a letter from Dr. Caudill to Dr. Wikstrom dated June 23, 2006, Dr. Caudill reported that Plaintiff complained mainly of pain in her left hip. Id. Plaintiff was diagnosed at that time with "[l]eft trochanteric bursitis" and "[d]egenerative

disc disease of the lumbar spine and cervical spine with spondylosis." Id. at 263. Dr. Caudill started Plaintiff on Percocet for her breakthrough pain, and continued the Kadian. Id. at 264. On July 28, 2006, Plaintiff returned to Dr. Caudill, complaining of "significant pain in her neck and her back as well as her knees." Id. at 280. Dr. Caudill noted that Plaintiff had "[f]ull range of motion" in her neck, but "flexion and extension does [sic] elicit significant tenderness in the cervical spine." Id. He ordered an MRI of the cervical and lumbar spine. Id.

On August 4, 2006, MRIs of the lumber and cervical spine were performed. Id. at 287-88. Tom Paganucci, M.D. ("Dr. Paganucci") read the MRIs. See id. Regarding the lumbar spine, Dr. Paganucci found "mild lumbar scoliosis and mild degenerative spondylosis[.]" Id. at 287 (capitalization omitted). There was "degeneration of the L1-2 and L5-S1 dis[c]s without evidence of focal dis[c] herniation." Id. (capitalization omitted). The MRI of the cervical spine showed "degeneration of the C4-5, C5-6, and C6-7 dis[c]s with advanced degenerative spondylotic changes at these levels." Id. at 288. On August 25, 2008, Plaintiff returned to Dr. Caudill, complaining of continued pain in the neck and lower back. Id. at 278. Dr. Caudill believed the MRIs showed "degenerative disc disease of the cervical and lumbar spine with some bulging of the disc and spondylosis of the upper and lower spine but no cord compression." Id. On September 25, 2006, Plaintiff had a cervical epidural injection and "tolerated the procedure very well without any complications." Id. at 275. The last visit with Dr. Caudill documented in the record occurred on October 24, 2006, at which time Plaintiff reported doing well with her "medical regimen" but reported "more breakthrough pain as she is doing more yard work lately." Id. at 276.

**5.    Dr. Valente**

Finally, on March 29, 2007, Plaintiff was seen by Dr. Jerry Valente ("Dr. Valente") for a consultative psychological evaluation.  Id. at 295-304.  Dr. Valente noted Plaintiff drove herself to the appointment, and arrived unaccompanied, without incident.  Id. at 295.  At that time, Plaintiff alleged "disability due to severe anxiety, panic attacks, Epstein Barr Syndrome, and chronic pain."  Id.  Dr. Valente indicated Plaintiff was able to engage in spontaneous conversation, with "no significant comprehension difficulties[.]" Id. at 296.  Her mood was described as "mildly anxious[.]"  Id.  Dr. Valente discussed, in great detail, Plaintiff's depression and the effects thereof.  Id. at 295-304.  Plaintiff was diagnosed with "Somatization Disorder," "Adjustment Disorder With Mixed Anxiety and Depressed Mood," "Acute Stress Disorder," and "Chronic Back and Neck Pain Secondary to MVA x 2, Epstein-Barr Virus[.]" Id. at 303.  Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 60.  Id.  The prognosis given was "[p]oor[.]"  Id.  Regarding Plaintiff's ability to function daily, Dr. Valente opined in part:

> Ms. Cole possesses all of her activities of daily living.  She is able to dress, groom, and feed herself on a routine basis.  Ms. Cole is able to drive.  She is also able to complete light household chores on a routine basis which do not require excessive amounts of time standing or lifting objects over five to seven pounds.  Ms. Cole is able to operate small household appliances and use a telephone.  She reported that she spends most of her day watching television, talking on the telephone, and sleeping.

Id. at 303.  Dr. Valente concluded in part: "Her proneness to experience problems with anxiety, depression, obsessive thinking, her health, and unusual thoughts might make it difficult for her to think clearly or function effectively." Id. at 304.  Dr. Valente also completed a "Medical Source Statement of Ability to do Work-Related Activities (Mental)," in which he

commented that Plaintiff's "MMPI-2 results indicate[] psychological dysfunction of mild to moderate severity." Id. at 305. He further commented that Plaintiff "has [a] tendency to exaggerate [her] symptoms." Id.

**B.    Testimony During the Hearing**

During the hearing, Plaintiff testified that she has carpal tunnel syndrome, producing difficulty typing, doing housework, and opening cans or bottles. Id. at 323-26. With regard to her neck injury, Plaintiff testified she is unable to move her neck from side to side without significant pain. Id. at 327. She indicated that when she is driving, she has to turn her whole body around to "look back[.]" Id. She normally keeps her head in a "downward position" because her neck cannot fully straighten. Id. Regarding her back, Plaintiff testified she is suffering from pain "[a]ll the time." Id. at 328. Plaintiff's left knee apparently bothers her "[e]very[ ]day." Id. at 329. Finally, Plaintiff indicated her right heel also gives her problems. Id. at 330.

According to Plaintiff, she can sit for ten to twenty minutes, stand in one position for thirty minutes, and walk about 600 feet at a time. Id. at 330-31. She testified that her pain is caused by the housework she performs. Id. at 332. She can comfortably lift "[t]wo pounds" at a time. Id. at 338. She can "sit and focus" for approximately ten minutes before having to get up. Id. at 337. She testified that Xanax makes her feel "like a zombie." Id. at 335. She also indicated that her medications can give her "[s]lurred speech" and cause her to think slowly. Id. When questioned by the ALJ about her panic attacks, Plaintiff indicated that since she started on Xanax, she no longer has them. Id. at 339-40. During

Plaintiff's testimony, the ALJ expressed concern that Dr. Wikstom's treatment notes contained very little detail about Plaintiff's anxiety. Id. at 340.

Plaintiff testified she had been on a trip to North Carolina within the past year. Id. at 343. Plaintiff rode in a car while someone else drove. Id. It was about a ten hour drive, and they stopped "several times" so she could stretch. Id. She also flew for eighteen straight hours to Singapore with her husband within the past three years. Id. at 344. While in Singapore, she frequently shopped, dined out, and walked around a six block radius. Id. at 345-46.

Plaintiff's testimony was followed by that of Mark Capps, a vocational expert. Id. at 349. The ALJ presented Mr. Capps with the following hypothetical:

> I want you to assume a 46 year old individual with a work background and education as testified to by the Claimant. I want you to assume the individual can sit up to six hours per day, up to one hour at a time. I want you to assume the individual can stand or walk up to four hours in a day, up to 20 minutes at a time. I want you to assume the individual could lift up to 20 pounds occasionally, five pounds frequently. I want you to assume occasional bending or stooping. No crawling. Occasional stairs, occasional crouching, no kneeling, occasional reaching above shoulder level. No work around unprotected heights. No work around moving and hazardous machinery or driving motorized vehicles. I want you to assume the individual speaks with a moderately reduced speed such as I think we've all observed today, that her speech is a little slow[er] than a normal speaking pace. And I want you to assume that all work functions would be reduced by 25 percent as far as speed. So the individual would work more slowly than the average individual. Could such an individual perform any of the past work of the Claimant?

Id. at 350. Mr. Capps testified Plaintiff would not likely be able to perform her past relevant work, but other jobs within the regional or national economy fit the hypothetical given, those being "ticket taker," "mailroom clerk," and "surveillance system monitor[.]" Id. at 351-52. After being questioned by Plaintiff's representative, Mr. Capps ultimately testified that if the

former hypothetical were changed to also include the limitations of only occasional handling items (because of the alleged problems with Plaintiff's hands), as well as "moderate impairment of concentration," there would be "[v]ery few, . . . almost non-existent" jobs available that Plaintiff could perform. Id. at 361.

## C. The ALJ's Decision

When determining whether an individual is disabled, an ALJ must follow the five-step sequential inquiry described in the Code of Federal Regulations, determining as appropriate whether the Plaintiff: 1) is currently employed; 2) has a severe impairment; 3) is disabled due to an impairment meeting or equaling one listed in the regulations; 4) can perform past relevant work; and 5) retains the ability to perform any work in the national economy. See 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).

After assessing Plaintiff's file, testimony, and medical and psychological history, the ALJ determined Plaintiff suffered from the following "severe" impairments: "degenerative disc disease of the cervical and lumbar spine, [and] anxiety disorder." Id. at 12. The ALJ determined Plaintiff's impairments do not result in one of the established impairments listed in the regulations. Id. The ALJ found that although Plaintiff is unable to perform her past relevant work, she is able to perform "jobs that exist in significant numbers in the national economy." Id. at 19-20. Relying on the vocational expert's testimony, the ALJ found that Plaintiff could perform the jobs of "ticket taker," "mail room clerk," and "surveillance systems monitor." Id. at 20. In a decision entered on July 21, 2007, the ALJ ruled Plaintiff is not

disabled for purposes of receiving disability insurance benefits and denied her claim. Id. at 21.

## III. Legal Standard

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). While no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). It is not for this Court to reweigh the evidence; rather, this Court reviews the entire record to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence—even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Security, 363 F.3d 1155, 1158-59 (11th Cir. 2004).

# IV. Discussion

Plaintiff challenges the ALJ's decision on three grounds. First, Plaintiff contends the ALJ improperly discounted the opinions of Plaintiff's treating and examining physicians with regard to Plaintiff's physical pain complaints. Pl.'s Mem. at 5-9. Second, Plaintiff argues the ALJ mischaracterized mental health records in discounting Plaintiff's treating physician for mental issues and ultimately finding that the symptoms of Plaintiff's anxiety disorder do not limit her from working; or alternatively, did not include all of Plaintiff's mental health restrictions in the hypothetical posed to the vocational expert. Id. at 10-12. Finally, Plaintiff contends the ALJ improperly assessed her residual functional capacity. Id. at 12-13. Each argument is discussed in turn.

**A.  Weight Given to the Medical Opinions of Plaintiff's Treating and Examining Physicians With Respect to Plaintiff's Physical Pain Complaints**

Plaintiff challenges the ALJ's analysis and findings with respect to three doctors who treated or examined her for complaints of physical pain: Dr. Nabidezah, Dr. Dehgan, and Dr. Caudill. See Pl.'s Mem. at 5-10. Dr. Nabidezah and Dr. Caudill both treated Plaintiff for complaints of physical pain. Dr. Dehgan, on the other hand, was an examining physician-- performing one physical examination at the Social Security Administration's request. The treating physicians' opinions are discussed first, followed by the examining physician's opinion.

### 1.    Plaintiff's Treating Physicians

The Social Security Administration has promulgated regulations instructing ALJs how to weigh the medical opinions[3] of treating physicians[4] properly.  See 20 C.F.R. § 404.1527(d).  Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(d)(2).  When a treating physician's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight it should be given by considering factors such as the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician.  Id.

If an ALJ concludes the medical opinion of a treating physician should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  Good cause exists when (1) the opinion is not bolstered by the evidence, (2) the evidence supports a contrary finding, or (3) the opinion is conclusory or inconsistent with the treating

---

[3]    Medical opinions are statements from physicians that reflect judgments about the nature and severity of a claimant's impairment, including symptoms, diagnosis, prognosis, and what the claimant can still do despite the impairment.  20 C.F.R. § 404.1527(a)(2).

[4]    A treating physician is a physician who provides medical treatment or evaluation to a claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required the for the medical condition.  See 20 C.F.R. § 404.1502.

physician's own medical records.  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240-41 (11th Cir. 2004); <u>see also</u> <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583-84 (11th Cir. 1991); <u>Schnorr v. Bowen</u>, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).  The ALJ must "state with particularity the weight he [or she] gave the different medical opinions and the reasons therefor."  <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 279-80 (11th Cir. 1987); <u>see also</u> <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1053 (11th Cir. 1986).

Plaintiff first asserts the ALJ "greatly discounted Dr. Nabizadeh's records by stating that the opinions [he] expressed were not consistent with the medical evidence of record."  Pl.'s Mem. at 7.  The undersigned is unable to locate any instance in the ALJ's decision where Dr. Nabizadeh's medical records and/or opinions therein with respect to Plaintiff's physical limitations are discounted.  Conversely, Dr. Nabizadeh's treatment notes are relied upon to make the determination that Plaintiff's degenerative disc disease does not produce the limiting effects Plaintiff suggests.[5]  <u>See</u> Tr. at 17-18.  Thus, Plaintiff's argument, as it pertains to Dr. Nabizadeh's opinion being discounted with respect to her physical limitations, is without merit.

Plaintiff also argues the ALJ improperly analyzed Dr. Caudill's opinion by failing to identify what weight it was given.  <u>See</u> Pl.'s Mem. at 8-9.  In the ALJ's opinion, he relied on Dr. Caudill's treatment notes and diagnoses to discount Dr. Dehgan's finding that Plaintiff suffered from "severe disc disease in the cervical spine at C4-7."  <u>See</u> Tr. at 17-18.  The ALJ

---

[5]     Plaintiff argues the ALJ improperly discounted Dr. Nabizadeh's opinion regarding Plaintiff's inability to work, relying on Dr. Nabizadeh's response to a question asked on a Treating Source Mental Health Report.  <u>See</u> Pl.'s Mem. at 9.  As Dr. Nabizedah appears to have rendered this opinion about Plaintiff's <u>mental</u> limitations rather than her <u>physical</u> limitations, it is discussed <u>infra</u> in Part IV. B.

did not explicitly state what weight was given to Dr. Caudill's opinion as a strict reading of Sharfarz and MacGregor might arguably require. See Sharfarz, 825 F.2d at 279; MacGregor, 786 F.2d at 1053 (stating that the ALJ must "specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error"). However, if an ALJ ignores or fails to properly discount a treating physician's opinion, as a matter of law, the ALJ has accepted the opinion as true. See MacGregor, 786 F.2d at 1053. Thus, because the ALJ did not discount Dr. Caudill's opinion, he must have accepted it as true as a mater of law. See id. Indeed, it appears the opinion was accepted as true by the ALJ, because Dr. Caudill's treatment notes and diagnoses were used to discount Dr. Dehgan's finding regarding Plaintiff's ability to work.

Ordinarily, the undersigned would see no reason to remand this case for the ALJ to state what might seem to be obvious with respect to Drs. Nabidezah and Caudill; however, because this case is due to be remanded for other reasons, on remand, the ALJ shall state the weight given to these doctors' opinions and, if the ALJ discounts the opinions, state the reasons therefore. See Sharfarz, 825 F.2d at 279; MacGregor, 786 F.2d at 1053.

## 2. Plaintiff's Examining Physician

Plaintiff argues the ALJ improperly weighed the opinion of Dr. Dehgan, a physician who performed a consultative examination at the request of the Social Security Administration. See Pl.'s Mem. at 7-9. "Generally, a treating doctor's opinion is entitled to more weight than that of a consulting doctor's." Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984) (internal citation omitted); see also 20 C.F.R. § 404.1527(d)(1)-(2). Moreover, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary

conclusion." <u>Oldham v. Schweiker</u>, 660 F.2d 1078, 1084 (5th Cir. Unit B 1981) (citing 20 C.F.R. § 404.1526).

> Here, the ALJ gave "little weight" to Dr. Dehgan's opinion, explaining as follows:

> In July 2005 consultative physician Dr. Dehgan's exam was consistent with the x-ray findings and Dr. Nabizadeh's treatment notes. Dr. Dehgan found the claimant's gait to be slow but normal and she exhibited no discomfort when arising from a chair and getting on the exam table. He also found full range of motion of the shoulders, elbows and hips and only mildly reduced range of motion of the cervical and lumbar spine and right wrist, right knee and right ankle. Straight leg raising was negative to 70 degrees and there were no positive neurological findings. However, Dr. Dehgan reviewed the x-rays apparently taken in May 2005 that showed mild to moderate degenerative arthritis and stated they showed severe disc disease in the cervical spine at C4-7. He also concluded that based on these x-rays as well as the claimant's history and neurological exam that he felt that the claimant was not a candidate for employment. The undersigned has significant problems with this opinion.

Tr. at 17-18. The ALJ went on to determine that Dr. Dehgan's opinion is contrary to that of Dr. Wardrop's (the radiologist who read Plaintiff's May 2005 X-ray). <u>Id.</u> at 18. Further, the ALJ noted Plaintiff had "normal or near normal range of motion" during Dr. Dehgan's examination. <u>Id.</u> Finally, the ALJ pointed out Dr. Dehgan's opinion is "at odds" with the findings of treating physician Dr. Caudill. <u>Id.</u>

Based on a comprehensive review of the record, the undersigned finds there is substantial evidence to support the ALJ's decision to discount Dr. Dehgan's opinion. First, the record supports the ALJ's finding that Dr. Dehgan's opinion is contrary to Dr. Wardrop's opinion. Dr. Wardrop made "no acute findings" and indicated Plaintiff suffered from "moderate degenerative disc disease of the mid cervical spine with more mild degenerative disc disease of the upper and lower cervical spine." <u>Id.</u> at 155, 157. Thus, his opinion differs significantly from Dr. Dehgan's opinion that Plaintiff suffers severe disc disease in the cervical spine. <u>See id.</u> at 215. Second, the record supports the ALJ's finding that Dr.

Dehgan's opinion is "at odds" with Dr. Caudill's opinion. Dr. Caudill found degenerative disc disease, but contrary to Dr. Dehgan's opinion, Dr. Caudill did not indicate it was severe. See id. at 263, 278. As a treating physician, Dr. Caudill's opinion is generally entitled to more weight than that of Dr. Dehgan. See Wilson, 734 F.3d at 518. Thus, the ALJ sufficiently identified several reasons for discounting Dr. Dehgan's opinion, and those reasons are supported by substantial evidence in the record.

The undersigned recognizes that the ALJ also pointed to Plaintiff's "normal or near normal range of motion" during the examination with Dr. Dehgan to discount Dr. Dehgan's ultimate opinion that Plaintiff is unable to work. Tr. at 18. Dr. Dehgan's report does not specifically identify whether Plaintiff's range of motion was normal or abnormal; rather, it identifies degrees of motion for certain areas of the body. See id. at 212-15. Although it would be difficult to conclude by reading Dr. Dehgan's report whether Plaintiff's range of motion was "normal" as suggested by the ALJ, the other evidence relied upon by the ALJ to discount Dr. Dehgan's opinion is sufficient to meet the substantial evidence standard.

**B.    ALJ's Analysis of Dr. Wikstrom's Opinion Regarding the Effect of the Symptoms Associated With Plaintiff's Mental Disorder and Inclusion of Mental Health Restrictions in the Hypothetical to the Vocational Expert**

With respect to Plaintiff's mental impairment, she advances two arguments: first, the ALJ erred by mischaracterizing mental health records in discounting the medical opinion of Dr. Wikstrom and in ultimately concluding that the symptoms of Plaintiff's anxiety are not so limiting as to preclude her from working;[6] and second, the ALJ erred by failing to include

---

[6]      In her Memorandum, Plaintiff titles the heading regarding this issue as follows: "Whether or Not the Court Incorrectly Characterized the Mental Health Records or in the Alternative Did Not Include all Restrictions in the Hypothetical to the Vocational Expert[.]" Pl.'s Mem. at 10 (capitalization and emphasis
(continued...)

Plaintiff's mental health restrictions in the hypothetical to the vocational expert.  <u>See</u> Pl.'s Mem. at 10-12.  Each is discussed in turn.

### 1.    ALJ's Analysis of Dr. Wikstrom's Opinion

Plaintiff cites the ALJ's discounting of Dr. Wikstrom's opinion regarding Plaintiff's ability to work based on her mental problems and argues the ALJ "must indicate what limitations are to be given to [Plaintiff's] work activities from a mental health perspective." Pl.'s Mem. at 11-12.  The law in the Eleventh Circuit governing treating physicians' opinions was previously discussed <u>supra</u> at Part IV.A.1.,and need not be repeated here.

Recognizing the absence of "objective findings" in Dr. Wikstrom's treatment notes and commenting that the doctor "provided virtually no findings or other information to support his opinion," the ALJ assigned "little weight" to Dr. Wikstrom's opinion.  <u>See</u> Tr. at 18-19.  With respect to Dr. Wikstrom's treatment notes and ultimate determination, the ALJ explained:

> The record shows that after one visit to Dr. Wikstrom he indicated that the claimant had a severe panic disorder and was unable to work.  A review of Dr. Wikstrom's notes do not contain objective findings that support his opinion, nor do they describe the claimant's panic attacks, i.e., when they occur, under what circumstances, etc.  Dr. Wikstrom's notes also contain no mental status evaluations, but instead show only increased or decreased levels of anxiety or stress during the claimant's various sessions that spanned a period of one year.

<u>Id.</u> at 18.  The ALJ correctly recognized that the notes do not describe Plaintiff's panic attacks.  <u>See</u> <u>id.</u> at 253-261.  Further, the notes merely document whether Plaintiff was experiencing increased or decreased levels of stress during each visit (on most occasions,

---

[6](...continued)
omitted).  Although the heading refers to an incorrect characterization of the mental health records, the body of the argument, in substance, focuses on the ALJ's analysis of evidence used to discount Dr. Wikstrom's opinion and to ultimately conclude that Plaintiff does not suffer symptoms from her mental disorder that would prevent her from working.  <u>See</u> <u>id.</u> at 10-12.

simply depicting an upward arrow for increased stress and a downward arrow for decreased stress). See id. The undersigned agrees that Dr. Wikstrom's treatment notes appear to be based solely on Plaintiff's subjective complaints and do not appear to be objective medical evidence which would support his ultimate opinion. See Schnorr, 816 F.2d at 582 (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence). Nevertheless, the ALJ failed to address material evidence that tends to support a finding of disability.

After analyzing the medical evidence pointing in a number of different directions on the issue of Plaintiff's mental health, the ALJ found Plaintiff has a "severe" anxiety disorder. See id. at 12. However, based on the above analysis of Dr.Wikstrom's notes, as well as the opinion of Dr. Valente (discussed infra at Part IV.B.1.b), the ALJ found "the claimant's statements concerning the intensity, persistence, and limiting effects of [the symptoms of anxiety] are not entirely credible." Id. at 17. While the explanation for discounting Dr. Wikstrom, standing alone, may arguably be supported by evidence in the record, the ALJ did not sufficiently explain whether he took into account all relevant evidence on this issue tending to support a finding of disability when discounting Dr. Wikstrom's opinion. Given the inconsistencies in the three doctors' opinions regarding Plaintiff's mental health, and the ALJ's use of some opinions to discount others, it was critical for the ALJ to identify and discuss all medical evidence pertaining to this issue. This was especially important because if a reviewing court is unable to determine whether an ALJ properly considered a treating physician's testimony, remand is required. See Wiggins v. Schweiker, 679 F.2d 1387, 1390 (11th Cir. 1982).

### a. Failure to Analyze Relevant Evidence in Discounting Dr. Wikstrom's Opinion

Evidence exists in the record, as specifically cited by Plaintiff, that contradicts the ALJ's findings regarding Plaintiff's limitations resulting from the symptoms of her mental disorder. This evidence is not explained by the ALJ in his analysis discounting Dr. Wikstrom's opinion, and generally concluding that the symptoms of Plaintiff's mental health restrictions are not as limiting as she suggests. Thus, the ALJ's analysis does not permit a meaningful review on this issue, and remand for further explanation is required.

In support of her argument that Dr. Wikstrom's opinion was improperly discounted, Plaintiff points to a questionnaire filled out after the hearing by Dr. Wikstrom to clarify the doctor's earlier diagnoses. See Pl.'s Mem. at 11. During the hearing, the ALJ commented that Dr. Wikstrom's records "certainly document[] [Plaintiff is] under treatment, but there's no real discussion of the severity of her complaints, how often she has panic attacks and so on." Tr. at 318. Recognizing the "completely inadequate notes" on the issue of whether Plaintiff suffers limiting effects from the symptoms of her anxiety, as suggested by Dr. Wikstrom, the ALJ permitted Plaintiff's representative to further inquire of Dr. Wikstrom whether his opinion would change or stay consistent in light of both the inadequacy of the treatment notes and Plaintiff's testimony. See id. at 339-42. In the questionnaire filled out by Dr. Wikstrom after the hearing, he indicated Plaintiff suffers from "severe panic disorder with marked symptoms," even "when she is taking her medication as prescribed[.]" Id. at 313. Dr. Wikstrom further stated that Plaintiff's "condition allow[ed] for periodic exacerbations of symptoms as described in the Treating Statement[,] even with the use of

her medications[.]" Id. Finally, Dr. Wikstrom opined Plaintiff would not be able to return to work and "focus and concentrate on tasks at hand[.]" Id.

In the analysis regarding this issue, the ALJ did not comment on this questionnaire.[7] Thus, the undersigned is unable to determine whether the ALJ took Dr. Wikstrom's comments on this questionnaire into account when discounting his opinion, and remand is required. See Wiggins, 679 F.2d at 1390. On remand, the ALJ should take Dr. Wikstrom's comments into account and indicate whether and to what extent they affect his determination regarding the symptoms of Plaintiff's mental impairment and the limiting effects thereof.

Additionally, in discussing Plaintiff's ability to work in light of her mental impairment, the ALJ relied partially on the "Treating Source Mental Health Report" completed by treating physician Dr. Nabidezah.[8] See Tr. at 18; see also id. at 158-59. In his opinion, the ALJ stated, "Dr. Nabidezah completed a questionnaire in April 2005 in which he indicated that the claimant had mild anxiety but no limitations." Id. at 18. Similarly, the Commissioner relies on Dr. Nabidezah's opinion at the beginning of the Report regarding mild anxiety (Doc. No. 12; "Deft.'s Mem." at 6). However, the ALJ apparently ignored and the Commissioner does not mention two inquiries later in the Report regarding the effects of Plaintiff's anxiety. The first of those inquiries being:

> Please provide a statement about what your patient can still do despite his / her mental impairment(s), addressing your patient's capacity for understanding and

---

[7] The ALJ did, however, mention the questionnaire when summarizing the medical evidence. See Tr. at 16.

[8] Plaintiff does make issue of the doctor's comments on this Report, albeit in the section of her memorandum regarding Plaintiff's complaints of physical pain. See Pl.'s Mem. at 6.

memory, sustained concentration and persistence, social interaction, and adaptation.

Tr. at 158. Dr. Nabidezah responded:

[A]lthough able, secondary to significant limitations in sit/stand/walk/prolonged postures, she will be unable to perform any duties.

Id. The second inquiry is as follows:

Is this individual capable of sustaining work activity for eight hours a day, five days a week? If not explain why using examples of behavioral objective data.

Id. Dr. Nabidezah responded to this question simply stating, "No– [.]" Id.

The ALJ did not mention these statements, nor comment on what effect they had, if any, on his determination of whether Plaintiff would have limitations from a mental standpoint on her ability to work. Further, while Dr. Nabidezah's initial statement regarding mild anxiety was mentioned by the ALJ in his discussion of Plaintiff's mental impairment, it is unclear from the opinion whether the ALJ intended to use this initial statement to discount Dr. Wikstrom's opinion. Thus, the ALJ relied on Dr. Nabidezah's statement concerning Plaintiff's mild anxiety for the purpose of finding incredible the limitations alleged by Plaintiff and possibly to discount Dr. Wikstrom's opinion, but the ALJ did not address the other statements (made on the same form) which tend to corroborate Plaintiff's allegations and Dr. Wikstrom's opinion. Although at first blush these statements may appear to be the sort of "brief and conclusory statement[s] made by the treating physician" that may not be "persuasive evidence of disability,"[9] the ALJ cannot ignore these statements, especially in light of the apparent material contradiction. See Wiggins, 679 F.2d at 1390. The undersigned is unable to determine whether the ALJ took Dr. Nabidezah's additional

---

[9] See Wilson, 734 F.3d at 518 (internal citation omitted).

statements into account when finding incredible the limitations alleged by Plaintiff and possibly discounting Dr. Wikstrom's opinion. See id. On remand, the ALJ should indicate whether he is relying on Dr. Nabidezah's opinion to discount Dr. Wikstrom's opinion, and discuss whether and to what extent Dr. Nabidezah's statements regarding Plaintiff's ability to work affect the ALJ's determination concerning the symptoms of Plaintiff's mental impairment and the limiting effects thereof.

### b. Reliance on Dr. Valente's Opinion to Discount Dr. Wikstrom's Opinion

Plaintiff also argues the ALJ improperly assessed Dr. Valente's psychological evaluation when using Dr. Valente's opinion to discount Dr. Wikstrom's opinion. Pl.'s Mem. at 11. Plaintiff asserts that while the ALJ used the observations and opinion in Dr. Valente's psychological evaluation to discount the level of limitation suggested by Plaintiff, "the assessment from Dr. Valente paints a picture of a person who has multiple mental health issues including the statement that 'erraticism and agitation characterize Ms. Cole's major depression.'" Id. at 11 (quoting Tr. at 302). Plaintiff does admit, however, "that the restrictions [imposed by] Dr. Valente are less severe from the restrictions [found by] Dr. Wikstrom." Pl.'s Mem. at 11-12.

Dr. Valente was an examining physician, evaluating Plaintiff on March 29, 2007. See Tr. at 295. After the examination, Dr. Valente completed a lengthy psychological evaluation, summarized by the ALJ as follows:

> Dr. Valente found no evidence of a panic disorder and instead listed a somatization disorder and mixed anxiety as primary diagnoses. He also did not find evidence of any severe mental disorder [and] he assigned a GAF score of 60 which equates to mild mental limitations. He also completed a medical source statement in which all limitations were found to be slight with the exception of understanding, remembering and carrying out detailed job

> instructions which he rated as moderate. Under the definition of "moderate" in this medical source statement, an individual with a moderate limitation is still able to function satisfactorily. Accordingly, Dr. Valente generally concluded that the claimant had no mental disorder that would seriously interfere with her ability to function in a worklike setting.

Id. at 18-19. The ALJ correctly recognized that Dr. Valente did not diagnose Plaintiff with a panic disorder. Instead, Plaintiff was diagnosed by Dr. Valente with "Adjustment Disorder With Mixed Anxiety and Depressed Mood," as well as "Acute Stress Disorder."[10] Id. at 303.

Next, the ALJ correctly identified that Dr. Valente assigned Plaintiff a GAF score of 60. See id. "The [GAF] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations." Mathis v. Astrue, No. 3:06-cv-816-J-MCR, 2008 WL 876955, at *7, n. 4 (M.D. Fla. Mar. 27, 2008) (unpublished) (citing Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") (4th ed. 1994) at 32). A GAF score of 61-70 indicates some mild symptoms as a result of the mental illness. Mathis, 2008 WL 876955, at *7, n. 4 (citing DSM-IV at 32).

While GAF scores have been frequently used in Social Security disability benefits determinations, courts have often given them limited weight. "Reliance upon a GAF score is of questionable value in determining an individual's mental functional capacity." Gasaway v. Astrue, No. 8:06-cv-1869-T-TGW, 2008 WL 585113, at *4 (M.D. Fla. Mar. 3, 2008) (unpublished) (citing Deboard v. Comm'r of Soc. Sec., No. 05-6854, 211 F. App'x 411, 415-416 (6th Cir. 2006) (unpublished)); see also Wind, 133 F. App'x at 692 n. 5 (noting that the Commissioner of Social Security has indicated that GAF scores have no direct correlation

---

[10]     Plaintiff was also primarily diagnosed with "Somatization Disorder." Id. at 303.

to the severity of a mental impairment); <u>Parsons</u>, 2008 WL 539060, at *7 (same). Even so, a GAF score as high as 65 has recently been found to equate to a non-severe impairment. <u>See</u> <u>Morris v. Astrue</u>, No. 5:07-cv-30-Oc-10GRJ, 2008 WL 754723, at *4 (M.D. Fla. Mar. 19, 2008) (unpublished).

Plaintiff's GAF score of 60 tends to corroborate the ALJ's finding that the effects of the symptoms of Plaintiff's mental impairment do not limit her from working. As indicated by the ALJ, the assignment of a GAF score of 60 based upon Plaintiff's overall functioning as a result of her mental impairment is consistent with Dr. Valente's comments on the "Medical Source Statement of Ability to do Work-Related Activities (Mental)." Tr. at 305. On the Medical Source Statement, Dr. Valente indicated Plaintiff would have "slight" difficulty with the following tasks: understanding and remembering short, simple instructions; carrying out short, simple instructions; and ability to make judgments on simple work-related decisions. <u>Id.</u> According to Dr. Valente, Plaintiff would have "moderate" limitation (while still being able to function satisfactorily) with the following tasks: understanding and remembering detailed instructions; and carrying out detailed instructions. <u>Id.</u> Finally, Dr. Valente commented, "[Plaintiff's] MMPI-2 results indicate psychological dysfunction of mild to moderate severity. Claimant has a tendency to exaggerate symptoms." <u>Id.</u>

Because Dr. Valente's opinion was supported by objective medical evidence and Dr. Wikstrom's was not, the ALJ chose to give Dr. Valente's opinion "considerable weight," while giving Dr. Wikstrom's opinion "little weight." <u>Id.</u> at 19. In doing so, the ALJ relied upon all the objective medical evidence produced in Dr. Valente's report, including "several tests, mental status evaluation, etc." <u>Id.</u> This decision viewed in isolation is arguably supported by substantial evidence; however, as discussed herein at Part IV.B.1.a., because the ALJ

did not discuss the other evidence in the record tending to corroborate Dr. Wikstrom's opinion or comment on the impact this evidence had, if any, on the ALJ's decision to discount Dr. Wikstrom's opinion, remand is necessary.

> **2.    Inclusion of Mental Health Restrictions in the Hypothetical to the Vocational Expert**

Plaintiff also argues the ALJ erred by failing to include any of Plaintiff's mental health restrictions in the hypothetical to the vocational expert.  Pl.'s Mem. at 12.  According to Plaintiff, "[t]his was error particularly since [the ALJ] found that [Plaintiff] had a 'severe' mental impairment[,] i.e. anxiety[,] and the medical report from Dr. Valente highlights several areas of concern from a mental health perspective."  Id.

In the fifth step of the sequential evaluation process, an ALJ may pose a hypothetical question to a vocational expert as part of his determination of whether the claimant can obtain work in the national economy.  See 20 C.F.R. § 416.920(a)-(f).  "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  Wilson v. Barnhart, 284 F.3d 1219, 1227(11th Cir. 2002) (citing Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999)); see also Loveless v. Massanari, 136 F. Supp. 2d 1245, 1250 (M.D. Ala. 2001).

As the Commissioner points out, Plaintiff fails to take into account that the hypothetical posed to the vocational expert considered Plaintiff's mental impairments because the effects of the impairments are controlled with medication.  See Deft.'s Mem. at 4.  At the hearing, Plaintiff testified that since she has been taking Xanax, she no longer suffers from panic attacks.  Tr. at 339-40.  However, Plaintiff stated that her medications

cause her to think slowly and give her "[s]lurred speech[.]" Id. at 335. After indicating Plaintiff would suffer "slowed speech and movements," from her medications, the ALJ determined, as part of the Residual Functional Capacity ("RFC"), that Plaintiff's "work functions are reduced 25% in speed."[11] Id. at 12. Accordingly, the ALJ added the following to the hypothetical posed to the vocational expert:

> I want you to assume the individual speaks with a moderately reduced speed such as I think we've all observed today, that her speech is a little slow[er] than a normal speaking pace. And I want you to assume that all work functions would be reduced by 25 percent as far as speed. So the individual would work more slowly than the average individual.

Id. at 350. It is apparent that the ALJ did take Plaintiff's mental health limitations into account when posing the hypothetical to the vocational expert. First, he relied on Plaintiff's own statement that she no longer suffers from panic attacks now that she is taking medication to control them. Second, the ALJ took the side effects of Plaintiff's medication(s) into account, as well as his own observations of the effects of the medications on Plaintiff's rate of speech. Therefore, because the ALJ's hypothetical to the vocational expert included the effects of her medication (that which treats Plaintiff's anxiety symptoms and eliminates her panic attacks), the hypothetical comprehensively described Plaintiff's impairments. See Wilson, 284 F.3d at 1227 (citing Jones, 190 F.3d at 1229).

## C. The ALJ's Assessment of Plaintiff's Residual Functional Capacity

Plaintiff contends the ALJ improperly assessed Plaintiff's RFC because: (1) No limitations were taken into account for Plaintiff's mental health issues; and (2) Contrary to the ALJ's finding, Plaintiff is limited to sedentary jobs rather than light duty jobs. See Pl.'s

---

[11] Plaintiff does not appear to dispute the accuracy of this determination, so the undersigned need not address whether it is supported by substantial evidence in the record.

Mem. at 12. The undersigned has already addressed the argument with respect to Plaintiff's mental health issues in Part IV. B., supra, and found the mental health issues were sufficiently taken into account. The the same analysis applies to Plaintiff's argument regarding the RFC. Accordingly, it need not be addressed again.

Plaintiff argues that "because [Plaintiff] was restricted in her ability to perform standing and walking functions to four hours per day, this would necessarily place her in a sedentary work capacity, not light duty." Pl.'s Mem. at 13. Plaintiff contends that the light duty jobs suggested by the vocational expert and adopted by the ALJ are inappropriate for Plaintiff. See id. Therefore, Plaintiff requests remand to "reformulate the hypothetical." See id.

The Social Security Regulations explain the difference between light work and sedentary work as follows:

> (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. . . .

20 C.F.R. §§ 404.1567 and 416.967. The full range of "[l]ight work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." Freeman

v. Barnhart, 220 F. App'x 957, 960 (11th Cir. 2007) (unpublished) (quoting SSR 83-10, 1983 WL 31251, *6 (emphasis added)).[12]

After considering all of Plaintiff's symptoms and the extent to which those symptoms could be reasonably accepted as consistent with the evidence, the ALJ made clear, thorough findings with respect to Plaintiff's RFC. See Tr. at 12-19. The ALJ determined Plaintiff had the RFC to engage in the following activities: lifting and/or carrying up to twenty pounds occasionally and five pounds frequently; standing and/or walking for four hours in continuous periods of up to twenty minutes, sitting for six hours in continuous periods of one hour; with occasional bending, stooping, crouching, reaching above shoulder level and stair climbing. Id. at 12. The ALJ also included that Plaintiff could not work at unprotected heights, around hazardous machinery, and could not operate a motor vehicle. Id. Finally, the ALJ indicated that "due to slow speech and movements all work functions are reduced 25% in speed." Id. The ALJ's expression of Plaintiff's exertional level accurately described her RFC, as determined on a function-by-function basis, and recognized Plaintiff could perform some, but not all, occupations at the light work level.

The ALJ's hypothetical to the vocational expert explicitly incorporated the functional limitations found by the ALJ, as the ALJ directed the vocational expert to presume that Plaintiff had the limitations listed above. Id. at 350. Taking these limitations into account, the vocational expert identified three occupations that exist in significant numbers in the national economy Plaintiff could perform: a "ticket taker"; a "mailroom clerk"; and a "surveillance system monitor[.]" Id. at 352. The two former jobs are classified as "Light

_____

[12]    "Full Range of Work" means all or substantially all occupations existing at an exertional level. SSR 83-10, 1983 WL 31251 at *6.

Work" by the Dictionary of Occupational Titles,[13] while the latter job is classified as "Sedentary Work[.]"[14] Plaintiff does not challenge the accuracy of the vocational expert's testimony, <u>see</u> Pl.'s Mem. at 13-14, and the testimony appears consistent with the Dictionary of Occupational Titles. Even if the ALJ incorrectly categorized Plaintiff's RFC, the vocational expert still identified a job at the sedentary level that Plaintiff can perform. <u>Id.</u> at 352.

Given the ALJ's function-by-function findings with respect to Plaintiff's physical capabilities and the testimony of the vocational expert, there is no reason reformulate the hypothetical to the vocational expert as Plaintiff requests. The ALJ clearly set out his findings as to Plaintiff's RFC and explicitly detailed Plaintiff's limitations; based on these limitations, the ALJ identified jobs that exist in significant numbers in the national economy that Plaintiff can perform. <u>See</u> <u>id.</u> at 20.

In accordance with the foregoing, it is hereby **ORDERED**:

1.    The Clerk of the Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) **REVERSING** the Commissioner's decision and **REMANDING** this matter with instructions to:

(A)    State the weight given to Drs. Nabidezah's and Caudill's respective opinions and, if they are discounted, the reason(s) for doing so;

---

[13]    <u>See</u> 1991 WL 672863, DICOT 344.667-010 (ticket taker); 1991 WL 671813, DICOT 671813 (mailroom clerk).

[14]    <u>See</u> 1991 WL 673244, DICOT 379.367-010 (surveillance system monitor).

(B)     Reconsider Dr. Wikstrom's responses to the post-hearing questionnaire, indicating whether and to what extent the responses affect the ALJ's discounting of Dr. Wikstrom's opinion and determination regarding the limiting effects of the symptoms  of Plaintiff's mental impairment; and

(C)     Indicate whether Dr. Nabidezah's opinion is being used to discount Dr. Wikstrom's opinion, and reconsider Dr. Nabidezah's responses to the questions on the "Treating Source Mental Health Report," indicating whether and to what extent the responses affect the ALJ's discounting of Dr. Wikstrom's opinion and determination regarding the limiting effects of the symptoms of Plaintiff's mental impairment.

2.     The Clerk is directed to close the file.

**DONE AND ORDERED** at Jacksonville, Florida on March 12, 2009.

*James R. Klindt*
**JAMES R. KLINDT**
United States Magistrate Judge

kaw
Copies to:
Counsel of record